The plaintiff in error was convicted in the Giles circuit court, for wearing a bowie-knife concealed under his clothes, under the act of 1837-1838, ch. 137, sec. 2, which provides "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than sic months.
It is now insisted that the above act of the Legislature is unconstitutional, and therefore the judgment in this case should have been arrested.
In the 1st article of the constitution of this State, containing a declaration of rights, sec. 26, it is declared "that the free white men of this State have a right to keep and bear arms for their common defence."
This declaration, it is insisted, gives to every man the right to arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ, and, thus armed, to appear wherever he may think proper, without molestation or hindrance, and that any law regulating his social conduct, by restraining the use of any weapon or regulating the manner in which it shall be carried, is beyond the legislative competency to enact, and is void. *Page 154 
In order to have a just and precise idea of the meaning of the clause of the constitution under consideration, it will be useful to look at the state of things in the history of our ancestors, and thus comprehend the reason of its introduction into our constitution.
By the act of 22 23 Car. II, ch. 25, sec. 3, it is provided that no person who has not lands of the yearly value of ƒ 100, other than the son and heir apparent of an esquire, or other person of higher degree, etc., shall be allowed to keep a gun, etc. By this act, persons of a certain condition in life were allowed to keep arms, while a large proportion of the people were entirely disarmed. But King James II, by his own arbitrary power, and contrary to law, disarmed the Protestant population, and quartered his Catholic soldiers among the people. This, together with other abuses, produced the revolution by which he was compelled to abdicate the throne of England. William and Mary succeeded him, and, in the first year of their reign, Parliament passed an act recapitulating the abuses which existed during the former reign, and declared the existence of certain rights which they insisted upon as their undoubted privilege. Among these abuses they say, in sec. 5, that he had kept a "standing army within the kingdom in time of peace, without the consent of parliament, and quartered soldiers contrary to law." Sec. 6. "By causing several good subjects, being Protestants, to be disarmed, at the same time when papists were both armed and employed contrary to law."
In the declaration of rights that follows, sec. 7 declares that "the subjects which are Protestant may have arms for their defence, [157] suitable to their condition and as allowed by law." This declaration, although it asserts the right of the Protestants to have arms, does not extend the privilege beyond the terms provided in the act of Charles II, before referred to. "They may have arms," says the Parliament. "suitable to other condition and as allowed by law." The law, we have seen, only allowed persons of certain rank to have arms, and consequently this declaration of right had reference to such only. It was in reference to these facts, and to this state of the English law, that the 2d section of the *Page 155 
amendments to the constitution of the United States was incorporated into that instrument. It declares that, "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."
In the same view the section under consideration of our own bill of rights was adopted.
The evil that was produced by disarming the people in the time of James II was that the king, by means of a standing army quartered among the people, was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defence was contemplated, or would have availed anything. If the subjects have been armed, they could have resisted the payment of excessive fines, or the inflication of illegal and cruel punishments. When, therefore, Parliament says that "subjects which are Protestants may have arms for their defence, suitable to their condition, as allowed by law," it does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the law. This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers had been quartered among them contrary to law. The complaint was against the government. The grievances to which they were thus forced to submit were for the most part of a public character, and could have been redressed only by the people rising up for their common defense, to vindicate their rights.
The section under consideration, in our bill of rights, was adopted [158] in reference to these historical facts, and in this point of view its language is most appropriate and expressive. Its words are, "the free white men of this state have a right to keep and bear arms for their common defence." It, to be sure, asserts the right much more broadly than the statute of 1 Williams Mary. *Page 156 
For the right there asserted is subject to the disabilities contained in the act of Charles II. There, lords and esquires, and their sons, and persons whose yearly income from land amount to ƒ 100, were of suitable condition to keep arms. But, with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms. But to keep and bear arms for what? If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove the doubt. It is declared that they may keep and bear arms for thier common defence. The word "common," here used, means, according to Webster: 1. Belonging equally to more than one, or to many indefinitely. 2. Belonging equally to the public. 3. General. 4. Universal. 5. Public. The object, then, for which the right of keeping and bearing arms is secured is the defence of the public. The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution. The words "bear arms," too, have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured is of general and public nature, to be exercised by the people in a body, for their common defence, so the arms the right to keep which is secured are such as are usually employed military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.
A thousand inventions for inflicting death may be imagined which might come under the appellation of an "arm," in the [159] figuartive use of that term, and which *Page 157 
could by no possibility be rendered effectual in war, or in the least degree and in the common defence. Would it not be absurd to contend that a constitutional provision securing to the citizens the means of their common defence should be construed to extend to such weapons, although they manifestly would not contribute to that end, merely because, in the hands of an assassin, they might take away life?
The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence. The right to keep and bear arms for the common defence is a great political right. It respects the citizens, on the one hand, and the rulers on the other. And, although this right must be inviolably preserved, yet it does no follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed.
To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil of infinitely greater extent to society than would result from abandoning the right itself.
Suppose it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns, and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience, and this were to become habitual; can it be that it would be beyond the power of the Legislature to pass laws to remedy such an evil? Surely not. If the use of arms in this way can not be prohibited, it is in the power of fifty armed ruffians to break up the churches, and all other public assemblages, where they might lawfully come, and there would be no remedy. But we are perfectly satisfied that a remedy might be applied. The convention, in securing the public political right in *Page 158 
question, did not intend to take away from the Legislature all power of regulating the social relations of the citizens upon this subject. It is true, it is somewhat difficult to draw the precise line where legislation must cease and where the political right begins, but it is not difficult to state a case where the right of legislation [160] would exist. The citizens have the unqualified right to keep the weapon, it being of the character before described as being intended by this provision. But the right to bear arms is not of that unqualified character, the citizens may bear them for the common defence; but it does not follow that they may be borne by an individual, merely to terrify the people or for purposes of private assassination. And, as the manner in which they are worn and circumstances under which they are carried indicate to every man the purpose of the wearer, the Legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence.
We are aware that the court of appeals of Kentucky, in the case of Bliss v. The Commonwealth, 2 Littell, 90, has decided that an act of their Legislature, similar to the one now under consideration, is unconstitutional and void. We have great respect for the court by whom that decision was made, but we can not concur in their reasoning. We think the view of the subject which the opinion of the court in that case take is far too limited for a just construction of the meaning of the clause of the constitution they had under consideration. It is not precisely in the words of our constitution, nevertheless it is of the same general import. The words are, that "the right of the citizens to bear arms in defence of themselves and the State shall not be questioned."
In the former part of this opinion we have recurred to the circumstances under which a similar provision was adopted in England, and have thence deduced the reason of its adoption, and consequently have seen the object in view when the right to keep and bear arms was secured. All these considerations are left out of view in the case referred to, and the court confine themselves entirely to the consideration of the distinction between a law prohibiting *Page 159 
the right, and a law merely regulating the manner in which arms may be worn. They say there can be no difference between a law prohibiting the wearing concealed weapons and one prohibiting the wearing them openly.
We think there is a manifest distinction. In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all. To bear arms in defence of the State is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, [161] muskets, rifles, etc., must necessarily be borne openly; so that a prohibition to bear them openly would be a denial of the right altogether. And, as in their constitution the right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State, we must understand the expressions as meaning the same thing, and as relating to public, and not private, to the common, and not the individual, defence.
But a prohibition to wear a spear concealed in a cane would in no degree circumscribe the right to bear arms in defence of the State; for this weapon could in no degree contribute to its defence, and would be worse than useless in an army. And, if as is above suggested, the wearing arms in defence of the citizens is taken to mean the common defence, the same observations apply.
To make this view of the case still more clear, we may remark that the phrase, "bear arms," is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use. The 28th section of our bill of rights provides "that no citizen of this State shall be compelled to bear arms provided he will pay an equivalent, to be ascertained by law." Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same sense in the 26th section, which secures to the citizen the right to bear arms. A man in the pursuit of deer, elk, and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms; much less could it be said that a private citizen bears arms because he had a dirk or pistol concealed under his clothes, or a spear in a cane. So that, *Page 160 
with deference, we think the argument of the court in the case referred to, even upon the question it has debated, is defective and inconclusive.
In the case of Simpson v. The State, 5 Yerg. 356, Judge White, in delivering the opinion of the court, makes use of the general expression that, "by this clause in the constitution, an express power is given and secured to all the free citizens in the State to keep and bear arms for their defence, without any qualification whatever as to their kind and nature."
But in that case no question as to the meaning of this provision in the constitution arose, or was decided by the court, and the expression is only an incidental remark of the judge who delivered the opinion, and, therefore, is entitled to no weight.
We think, therefore, that upon either of the grounds assumed in this [162] opinion the Legislature had the right to pass the law under which the plaintiff in error was convicted. Let the judgment be affirmed.
 *Page 10